UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 18-10101-RWZ

UNITED STATES OF AMERICA

v.

RAMON SOSA

MEMORANDUM OF DECISION

October 22, 2019

ZOBEL, S.D.J.

Defendant Ramon Sosa ("Sosa" or "defendant") is charged with possession with intent to distribute cocaine and cocaine base, 21 U.S.C. § 841(a)(1) (Count I), being a felon in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(1) (Count II), and possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A) (Count III). He moves to suppress a statement he made to police officers after his arrest on the ground that it was not voluntary. Following an evidentiary hearing and arguments of counsel, the motion (Docket # 59) is denied.

## I. Findings of Fact[1]

---

[1] Defendant filed an ambulance report (Docket # 59-5) and hospital records (Docket # 59-6) under seal. But both parties extensively quote from these documents in their unsealed filings and the documents were admitted as exhibits, without objection, at the evidentiary hearing. The documents are therefore unsealed, but only to the extent the parties and the court quote to them.

### A. Execution of Search Warrant and Arrest of Defendant

On January 23, 2018, around 3:00 p.m., federal and state law enforcement officers arrived at an apartment in Malden, Massachusetts, to execute a search warrant and investigate Sosa's alleged drug distribution. Detective Salvatore Gennetti ("Gennetti") and several other officers entered the apartment, while Sergeant Steven Fitzpatrick ("Fitzpatrick") monitored the perimeter of the building from his police cruiser.

The officers knocked on the apartment door and announced their presence. When no one answered, they forced entry. Two individuals, Ralph Bonano Jr. and Diane Shea, were in the living room. Officers searched and cleared one bedroom of the apartment and forced open the locked door to a second bedroom, which Diane Shea stated was Sosa's. No one was inside that bedroom, but one of the officers noticed an open window and saw a man outside, walking away from the building.

Gennetti and another officer ran out of the apartment to pursue the man. Meanwhile, Fitzpatrick noticed the man, got out of his cruiser, and gave chase. He caught up to the individual, ordered him to the ground, and recognized him as Sosa. Gennetti then handcuffed Sosa, explained that he was not under arrest, and read him his Miranda rights. When asked whether, having these rights in mind, he wished to speak with officers, Sosa replied "no." The officers continued the search of the apartment, where they found a handgun, ammunition, and various controlled substances in the second bedroom. Then, at 3:32 p.m., officers informed Sosa that he was under arrest and transported him to the Malden Police Station.

### B. Ambulance Call and Booking Process

When defendant arrived at the station, he began "nodding off" in the booking room, Docket # 59-1 at 4, and, according to Fitzpatrick's testimony, officers had to "nudge" defendant repeatedly to wake him up. At 4:49 p.m., Fitzpatrick called for an ambulance to assess defendant. At 4:52 p.m., while waiting for the ambulance's arrival, Fitzpatrick initiated the booking process by asking defendant for his name and address and entering the information into a computer to generate a booking report. See Docket # 59-3. At 4:56 p.m., the ambulance arrived and Emergency Medical Technician ("EMT") Ryan McMamus ("McMamus") examined defendant. See Docket # 59-5 at 1.

According to the ambulance record and McMamus's testimony, defendant stated that he felt ill because he was withdrawing from heroin. Id. at 2. McMamus checked defendant's vital signs at 5:01 p.m. Defendant's blood pressure was slightly elevated, his heart rate and pulse were within normal limits, his airway was clear, and he was breathing normally. McMamus asked defendant a series of questions and determined that defendant was oriented to event, person, place, and time. Id. Defendant was also evaluated on the Glasgow Coma Scale, which measures an individual's alertness and consciousness. He received the highest scores in each category: eyes, verbal, and motor. These results, McMamus testified, indicate that defendant trained his eyes and maintained eye contact, provided appropriate verbal responses without slurring, and had full range of motion with his extremities.

At 5:04 p.m., defendant signed a refusal of treatment and transportation form and the ambulance left. McMamus testified that "virtually" everyone assessed is offered transportation to the hospital and may refuse, unless they are not in the "right state of mind" to do so. Docket # 75 at 28-29. After leaving the Malden Police Station, McMamus summarized his interaction with defendant in an ambulance report: "[Patient] stated he did not feel nauseous and was not vomiting … Vitals were within normal limits, no sense of sweating. Crew[']s assessment revealed no abnormalities and no indications of opioid withdrawal … officer noted he would keep a closer eye on [patient] for development of symptoms." Docket # 59-5 at 2.

Immediately after the ambulance left, Fitzpatrick resumed the booking process. Defendant provided additional information, including his mother's maiden name, his occupation and the name of his employer, as well as the name, partial address, and telephone number of his girlfriend. Docket # 59-3 at 3. At 5:14 p.m., Fitzpatrick again read defendant his <u>Miranda</u> rights. Defendant orally indicated that he understood his rights and he signed a Statement of Rights form, which acknowledged these rights and stated that he wished to speak with officers. Docket # 59-4.

Fitzpatrick next asked defendant several questions regarding his mental health. Defendant indicated that he had received psychiatric care from an unknown physician in Everett. He also stated that he had previously attempted suicide at his sister's house in Revere. Docket # 59-3 at 4.

### C. Strip Search and Discovery of Drugs

Immediately after Fitzpatrick finished the booking questions, Gennetti and another officer brought defendant to a cell for a strip search. The officers asked defendant to pull down his pants and underwear and to squat. When defendant complied, Gennetti observed a plastic bag containing a white substance near defendant's genitals. Defendant handed the bag to Gennetti and Gennetti asked defendant, "What is that?" Docket # 75 at 51. Defendant responded that he "grabbed it off the table" before he "jumped out of the window." Docket # 59-1 at 4. According to the government, the bag tested positive for cocaine. The officers did not ask defendant any additional questions or in any way seek further information from him.

### D. Subsequent Hospitalization

Defendant remained at the Malden Police Station until about 7:09 p.m., when officers took him to the Cambridge Health Alliance Everett Hospital.[2] According to hospital records, he was "somnolent" and "snoring" upon arrival. Docket # 59-6 at 8. At 7:29 p.m., he was administered blood and urine tests, which tested negative for opiates and positive for cocaine. Id. at 16-17. Nonetheless, he was given the opioid reversal drug, Narcan. Several hours later, defendant was administered a CAT Scan, the initial results of which showed "multiple radiopaque tablets" in his colon.

Defendant was discharged at 9:38 a.m. on January 24, 2018. His final CAT Scan results, which became available after his discharge, indicated the presence of

---

[2] Gennetti and Fitzpatrick both testified that they were not involved in defendant's transport to the hospital and did not know what precipitated the decision to take defendant there.

"multiple … foreign bodies throughout the bowel from the stomach to the … colon … consistent with the patient's history of ingested drug packets." Docket # 59-6 at 14.

## II. Legal Standard

Under Miranda v. Arizona, 384 U.S. 436, 444 (1966), prior to any questioning, law enforcement officials must advise an individual in custody that he has a right to remain silent, that statements he makes may be used as evidence against him, that he has the right to an attorney, and that if he cannot afford an attorney one will be appointed for him.

An individual may waive these rights so long as he does so voluntarily, knowingly, and intelligently. Id. A waiver is voluntary when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). A waiver is knowing and intelligent if made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. When evaluating a waiver, the court begins with the presumption that the defendant did not waive his rights and the government bears the burden of proving the valid waiver by a preponderance of the evidence. United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000).

When a defendant refuses to speak with law enforcement, his "right to cut off questioning" must be "scrupulously honored" by law enforcement. Michigan v. Mosley, 423 U.S. 96, 103-04 (1975). If law enforcement resumes questioning after a defendant

invokes his right to remain silent, the admissibility of a subsequent statement is determined in accordance with the so-called "Mosley factors" articulated by the Supreme Court. They include: (1) whether a significant amount of time lapsed between the defendant's invocation of the right and further questioning; (2) whether the same officer resumes questioning; (3) whether the defendant is given a fresh set of Miranda warnings; and (4) whether the subsequent questioning concerns the same crime as the subject of the interrogation previously cut off or refused by the defendant. Id. at 104-06. See also United States v. Lugo Guerrero, 524 F.3d 5, 12 (1st Cir. 2008); United States v. Oquendo-Rivas, 750 F.3d 12, 17-18 (1st Cir. 2014). These factors provide a framework for assessing admissibility, but the court must ultimately "look to the totality of the circumstances," and "[t]he key inquiry remains whether defendant 'was in charge of the decision whether and to whom he would speak.'" Lugo Guerrero, 524 F.3d at 12 (alteration in original) (quoting United States v. Thongsophaporn, 503 F.3d 51, 57 (1st Cir. 2007)).

## III. Discussion

Defendant moves to suppress only his statement about the drugs found during the strip search: "I just grabbed it off the table before I jumped out of the window".[3]

### A. Second Miranda Warnings and Waiver

---

[3] The supposed import of the statement is not entirely clear. It does not, without more, establish that the other contraband found in the second bedroom belonged to defendant, particularly considering the presence of two other individuals in the apartment.

I begin with the third Mosley factor—whether the defendant was given a renewed set of Miranda warnings—because it is the most significant in the instant case. Defendant argues that he was too intoxicated to understand his second Miranda warnings or waive his rights at the police station by signing the Statement of Rights form. But the timeline of events, the witnesses' testimony, and the signed waiver establish by a preponderance of the evidence that his waiver was valid.

I first note the proximity in time between McMamus' evaluation of defendant and the Miranda waiver. Between 4:56 p.m. and 5:04 p.m., McMamus assessed defendant. I credit his statement that the assessment, while brief, "revealed no abnormalities" and his resultant determination that defendant was highly alert and conscious. Docket # 59-5 at 2. The booking process resumed immediately after the EMTs left, at which point defendant was aware of what was happening, "very conscious," and "coherent," according to Fitzpatrick's testimony. Docket # 75 at 85, 90. Defendant's detailed responses to Fitzpatrick's questions during booking confirm that he was responsive and oriented to the situation. See Docket # 59-3.

Defendant's waiver is timestamped 5:14 p.m.—a mere ten minutes or so after McMamus' evaluation. At this point, defendant verbally indicated he understood his rights and wished to talk to law enforcement and he signed a written Statement of Rights. Fitzpatrick also testified that defendant placed a phone call without any assistance. It was shortly after he signed the waiver form that the strip search occurred, during which defendant was able to follow Gennetti's instructions to squat and remove his pants and underwear.

Defendant makes much of his subsequent hospitalization nearly two hours later, suggesting that he was not "in control of his own body, let alone his mind" while at the Malden Police Station earlier. Docket # 59 at 12. But, according to hospital records, officers stated that they were concerned that defendant ingested drugs while running from police outside of the apartment building because, although defendant was "awake and alert" earlier, he "became increasingly somnolent." Docket # 59-6 at 5, 8. This information supports the conclusion that defendant was coherent during the booking process, second Miranda warnings, and strip search, but gradually became more lethargic or impaired throughout the evening.

Given the evidence, I find that the government has met its burden to establish that defendant was in control of his decision to waive his Miranda rights and that the waiver was knowing and intelligent. See United States v. Cintron, No. 07–CR–10435–NMG, 2009 WL 924423, at *3 (D. Mass. 2009) (finding Miranda waiver valid even though defendant's heroin intoxication during questioning caused slurred speech, inability to stay awake, and a lack of balance and coordination); United States v. McForbes, 110 F. Supp. 3d 332, 336-37 (D. Mass. 2015), aff'd, No. 16-1281, 2018 WL 7959183 (1st Cir. Nov. 26, 2018) (upholding Miranda waiver of defendant on Suboxone and other substances in light of other evidence that he was alert and coherent).

I also find that defendant's waiver was voluntary. There is no evidence that defendant's will was overborne or that law enforcement coerced his statement. A strip search is a standard part of the booking process and, contrary to defendant's assertion, there is no evidence that it imposed "undue psychological pressure." Docket # 59 at 15.

Finally, the "questioning" at issue here involved a single question by Gennetti on finding the bag of drugs. This was not a situation in which law enforcement wore down defendant's resistance through interrogation.

### B. Other Mosley Factors

The three remaining Mosley factors also support a denial of the motion to suppress. Approximately two hours passed between defendant's initial invocation of his right to remain silent when he was caught and Gennetti's question during the strip search at the police station. Mosley, 423 U.S. at 107 (finding two hours to be a "significant period" of time). The same officer—Gennetti—advised defendant of his Miranda rights outside of the apartment and asked him about the bag of drugs during the strip search, but another officer—Fitzpatrick—gave defendant his second Miranda warnings and secured defendant's written waiver. And because defendant was not truly questioned about a crime outside of the apartment, this is not a situation in which the subsequent questioning "concerns the same crime as the interrogation previously cut off." Lugo Guerrero, 524 F.3d at 12.

## IV. Conclusion

Defendant's motion to suppress (Docket # 59) is DENIED.

| 10/22/2019 | /s/ Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL |
| | SENIOR UNITED STATES DISTRICT JUDGE |